UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JULIE ANNE KEMPF, on behalf of herself and all others similarly situated,

Plaintiff,

and

STATE OF WASHINGTON,

Intervenor,

v.

FULLBEAUTY BRANDS OPERATIONS, LLC,

Defendant.

C25-1141 TSZ

ORDER

This class action is just one of over sixty (60) cases pending in this District that involve claims under Washington's Commercial Electronic Mail Act ("CEMA"), which was enacted in 1998 amidst "an increasing number of consumer complaints about commercial electronic mail." *See Brown v. Old Navy, LLC*, 4 Wn.3d 580, 583, 567 P.3d 38 (2025) (quoting Laws of 1998, ch. 149, § 1). CEMA provides in relevant part:

> No person may initiate the transmission . . . of a commercial electronic mail message from a computer located in Washington or to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that . . . [c]ontains false or misleading information in the subject line.

RCW 19.190.020(1)(b). A violation of CEMA constitutes "an unfair or deceptive act in trade or commerce" and involves a matter "vitally affecting the public interest," thereby

satisfying on a *per se* basis the first three of the five elements of a claim under Washington's Consumer Protection Act ("CPA"). *See* RCW 19.190.030(3); *see also* *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 719 P.2d 531 (1986).[1] CEMA provides that "[d]amages to the recipient of a commercial electronic mail message . . . sent in violation of this chapter are five hundred dollars, or actual damages, whichever is greater." RCW 19.190.040(1).[2]

In *Brown*, the Washington Supreme Court held that CEMA "prohibits the use of *any* false or misleading information in the subject line of a commercial e-mail," not just false or misleading information "about the commercial nature of the message." 4 Wn.3d at 583 (emphasis added). In the wake of *Brown*, numerous class actions were filed in state court and removed to this District.

In this case, plaintiff Julie Anne Kempf alleges that she and other Washington residents received from defendant FullBeauty Brands Operations, LLC ("FullBeauty"), in violation of CEMA, e-mails with false or misleading information in their subject lines.

---

[1] To establish a violation of the CPA, a private plaintiff must prove: (i) the defendant engaged in an unfair or deceptive act or practice; (ii) such act or practice occurred in the conduct of trade or commerce; (iii) such act or practice affected the public interest; (iv) the plaintiff suffered an injury to his, her, or its business or property; and (v) a causal relationship exists between the defendant's act or practice and the plaintiff's injury. *Hangman Ridge*, 105 Wn.2d at 784–93.

[2] CEMA does not establish an independent private cause of action for damages unless they are related to "phishing" violations; instead, it specifies damages recoverable pursuant to the CPA. *See* *Wright v. Lyft, Inc.*, 189 Wn.2d 718, 406 P.3d 1149 (2017); *see also* *id.* at 725 (defining "phishing" as "Internet activity using fraudulent e-mails and websites to induce someone to reveal personally identifying information under false pretenses"). In contrast, with respect to all CEMA violations (not just "phishing" e-mails), the statute authorizes a claim for injunctive relief. *See* *Wright v. Lyft, Inc.*, No. 14-CV-421, 2016 WL 7971290, at *4 (W.D. Wash. Apr. 15, 2016); *Gragg v. Orange Cab Co.*, 145 F. Supp. 3d 1046, 1050–52 (W.D. Wash. 2015).

See Am. Compl. at ¶¶ 72–73 & 90–92 (docket no. 22). Pursuant to Federal Rule of Civil Procedure 12(b)(6), FullBeauty has moved to dismiss Kempf's CEMA claim (and her related CPA claim) on grounds that CEMA is preempted by federal law and/or is unconstitutional and that Kempf has not adequately pleaded FullBeauty's knowledge of her residency or the falsity of certain e-mail subject lines at issue. See Def.'s Mot. at 5–24 (docket no. 25). As permitted by 28 U.S.C. § 2403(b), the State of Washington has intervened to defend the constitutionality of its statute and the exercise of its police powers. See Intervenor Resp. at 2–3 (docket no. 33); see also Stip. & Order (docket no. 29). The Court concludes, for the reasons stated in this Order, that (i) the Amended Complaint sets forth plausible CEMA and CPA claims, (ii) CEMA is not preempted by federal law,[3] and (iii) CEMA is not unconstitutional under the dormant Commerce Clause.[4] FullBeauty's motion to dismiss is therefore DENIED.

/ / /

/ / /

/ / /

---

[3] Federal law may preempt state law in one of three ways: (i) via Congress's express terms; (ii) by inferring from pervasive federal regulation in a particular field that Congress intended to leave no room for the States to legislate; or (iii) by implication when a state statute actually conflicts with federal law. See, e.g., Silvas v. E*Trade Mortg. Corp., 514 F.3d 1001, 1004 (9th Cir. 2008) (quoting Bank of Am. v. City & County of San Francisco, 309 F.3d 551, 558 (9th Cir. 2002)). FullBeauty does not rely on either the second (field) or the third (conflict) form of preemption.

[4] Implicit in the United States Constitution's affirmative grant to Congress of the authority to regulate commerce among the several States is a limitation upon the power of the States. See Sam Francis Found. v. Christies, Inc., 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc). This limitation is known as the "dormant Commerce Clause." See id.

**Discussion**

**A. Stating a Claim Upon Which Relief Can Be Granted**

A complaint challenged by a Rule 12(b)(6) motion need not provide detailed factual allegations, but it must offer "more than labels and conclusions" and contain more than a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The pleading must indicate more than mere speculation of a right to relief. *Id.* In ruling on a motion to dismiss, the Court must assume the truth of the plaintiff's allegations and draw all reasonable inferences in the plaintiff's favor. *E.g.*, *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). The threshold question for the Court is whether the facts in the complaint sufficiently state a "plausible" ground for relief. *Twombly*, 550 U.S. at 570.

**1. Knowledge of Kempf's Residency**

FullBeauty "manufactures, markets, advertises, and distributes products" under the brands "Woman Within" and "Catherine's." *See* Am. Compl. at ¶ 6 (docket no. 22). According to the operative pleading, FullBeauty encourages online shoppers to create accounts in which their e-mail, billing, and shipping addresses are stored. *Id.* at ¶ 49. Moreover, when an online order is placed, FullBeauty links an e-mail address with the billing and/or shipping address associated with the purchase. *Id.* at ¶ 48. Although Kempf alleges that she has received "thousands of marketing emails from Woman Within and Catherine's" since June 2021, at a rate of "at least one email a day, and sometimes several emails every day," *id.* at ¶¶ 65–66, she does not indicate that she ever created an online account, bought any merchandise, or otherwise provided her physical address to

FullBeauty. Kempf does allege, however, that FullBeauty "knew, or had reason to know" that her "electronic mail address was held by a Washington resident." *Id.* at ¶ 67. Kempf contends that FullBeauty acquired knowledge of her residency through various first-party and third-party data collection methods. *See id.*

Kempf asserts that among FullBeauty's first-party data collection approaches is the use of "cookies, web beacons, and other tracking technologies," via which FullBeauty can identify and locate individuals who click on links contained in its marketing e-mails or who visit its website. *Id.* at ¶ 51. For support, Kempf cites FullBeauty's Privacy Policy, which discloses that a user's location and Internet Protocol ("IP") address might be among the data acquired through cookies, web beacons, and other tracking technologies. *See id.* at ¶ 54.

In Kempf's pleading, "web beacons" (also known as "tracking pixels" or "tracking tags") are described as tools via which FullBeauty can learn whether an e-mail was opened, how much of it was viewed, for how long, and via what type of device, whether any links in the e-mail were clicked, the recipient's IP address, and the recipient's location. *Id.* at ¶ 55. Kempf alleges that, while located in Washington and using either her computer or smart phone, she has clicked on links in FullBeauty's e-mails or its advertisements on certain social media platforms. *See id.* at ¶ 67. From these actions on her part, Kempf infers that FullBeauty could have, via its "cookies," "web beacons," and other tools, associated her e-mail address with both her IP address and her Washington residency. *See id.*; *see also id.* at ¶ 56 (quoting FullBeauty's previous privacy policy,

which advised that the company "also collect[s] your IP address, which may allow [it] to determine your location, including to determine your mailing address").

With regard to third-party analytics, FullBeauty has publicly announced its use of information collected by Adobe Inc., Google (Alphabet Inc.), and Meta Platforms, Inc. (which operates Facebook, Instagram, WhatsApp, and other communication services), as well as third-party vendor Epsilon Data Management LLC ("Epsilon"). *See id.* at ¶¶ 57–58. Epsilon touts its "COREid" product as an "industry-leading proprietary demographic data set that has name and address info on 255 million people." *Id.* at ¶ 58. As a result of its partnerships, Epsilon can match an e-mail address to known consumer profiles that include state or zip code level data. *See id.* at ¶ 59. Epsilon provides its clients (like FullBeauty) with a "dashboard" that allows them to examine certain metrics, including "demographics," which includes location information. *See id.* at ¶ 60. Kempf therefore concludes that FullBeauty knows or has reason to know where its e-mails are going. *See id.*

FullBeauty argues that Kempf has shown no more than mere possibility, as opposed to the requisite plausibility, with respect to FullBeauty's knowledge of her residency, citing *Beagle v Amazon.com, Inc.*, No. C24-316, 2024 WL 4028290 (W.D. Wash. Sept. 3, 2024). *Beagle* is not on point because it involved federal and state statutes that require proof of an *actual* "disclosure" of protected personally identifiable information ("PII"), *see id.* at *2–3 (construing 18 U.S.C. § 2710(b)(1) & Cal. Civ. Code § 1799.3(a)), as opposed to CEMA, which includes both actual ("knows") and constructive ("has reason to know") avenues of liability, *see* RCW 19.190.020(1)(b). The

*Beagle* Court's ruling that the plaintiffs' allegation of "access" to PII did not plausibly plead *actual* "disclosure" of PII[5] does not support FullBeauty's contention that, by identifying with particularity FullBeauty's data collection techniques, Kempf has not adequately alleged *constructive* knowledge of her Washington residency.

FullBeauty asserts that "courts have repeatedly cast doubt on the reliability of using IP addresses for geolocation purposes," *see* Def.'s Mot. at 21 (docket no. 25), but the cases on which it relies are distinguishable. For example, in *Gutierrez v. Converse Inc.*, No. 23-cv-6547, 2024 WL 2106952 (C.D. Cal. May 2, 2024), the issue of whether an IP address constituted "definitive evidence" of a chat feature user's location was raised in response to a motion to compel discovery, as opposed to within a motion to dismiss, when the allegations of the operative pleading must be accepted as true. In *Malibu Media, LLC v. Doe*, No. 14-cv-60259, 2014 WL 2615351 (S.D. Fla. May 21, 2014), the *sua sponte* ruling merely directed the plaintiff to show cause why the case should not be dismissed for improper venue, *id.* at *2, and no decision was ever reached concerning the reliability of geolocation technology.[6] Any suggestion that *Malibu Media*

---

[5] Based on this reasoning, the claims in *Beagle* were later dismissed with prejudice, and the matter is now pending before the United States Court of Appeals for the Ninth Circuit. *Beagle v. Amazon.com, Inc.*, No. C24-316, 2025 WL 1782958 (W.D. Wash. May 30, 2025), *appeal filed*, No. 25-3989 (9th Cir. June 24, 2025).

[6] In *Malibu Media*, the plaintiff filed a response to the order to show cause, and then, three days later, sought an extension of time to effect service of process on the defendant. *Malibu Media, LLC v. Doe*, No. 14-cv-60259, Pl.'s Resp. (docket no. 12) & Pl.'s Mot. (docket no. 13) (S.D. Fla. May 30, 2014 & June 2, 2014). The plaintiff's motion for an extension was denied, and the case was dismissed without prejudice for failing to serve the defendant within 120 days after the action commenced. *Malibu Media, LLC v. Doe*, No. 14-cv-60259, Orders (docket nos. 14 & 15) (S.D. Fla. June 6, 2014).

and/or the "technical literature" cited therein may be used to contradict the allegations of the Amended Complaint in this matter ignores the standards applicable to Rule 12(b)(6) motions.

FullBeauty cites no authority that would permit the Court to disregard the allegations of the operative pleading, to draw inferences against Kempf, or to consider contradictory facts or technological information outside the Amended Complaint. The Court is satisfied Kempf has pleaded a plausible claim that, sometime during the period at issue, FullBeauty acquired Kempf's IP address and location data, and that it had actual and/or constructive knowledge about her residency.

**2. <u>Falsity of Subject Lines</u>**

Kempf alleges that the subject lines of e-mails FullBeauty has sent her were false or misleading in four ways: (i) identifying an illusory time limit for a promotion or sale; (ii) mischaracterizing the nature of the e-mail (for example, "Your Easter Dress Order Just Shipped!" or "Order Pending: Just Need Your Confirmation," when no order was placed); (iii) misrepresenting that a promotion was available "sitewide," when it was not, and (iv) referencing sham prices for purposes of advertising a percentage discount. *See* Am. Compl. at ¶¶ 11–45 (docket no. 22). In its motion to dismiss, FullBeauty challenges the sufficiency of the operative pleading with respect to only the first category of e-mail subject lines. *See* Def.'s Mot. at 22–23 (docket no. 25). The Court will similarly limit its review.

According to the Amended Complaint, FullBeauty uses the phrases "today only," "ends tonight," and the like in its e-mail subject lines to create a false sense of urgency,

while never intending to terminate the sale by the described deadline. *See* Am. Comp. at ¶¶ 17–24. Kempf provides three examples relating to the "Woman Within" brand and two examples concerning the "Catherine's" brand, in which, on the day after an e-mail containing a deadline was sent, another e-mail was generated that indicated the sale had been "EXTENDED!" *Id.* at ¶ 22. Kempf contends that the relative timing and pattern of these five sets of messages suggests that FullBeauty had already planned a next-day "extension" before announcing the related limited-time offer in the subject-line of an e-mail; in other words, in each instance, the subject line conveyed false or misleading information. *See id.* at ¶ 23. On at least one occasion, the body of the e-mail identified a promotion expiration date that was two days after the date of the e-mail, the subject line of which said, "Last Call for 50% Off Sitewide! Ends Tonight!" *Id.* at ¶ 22 & 24.

FullBeauty contends that this two-day discrepancy resulted from a scrivener's error, *see* Def.'s Mot. at 23 n.9 (docket no. 25), and that the low number of examples (only five during the period from November 29, 2022, to November 14, 2024) suggests that an explanation more plausible than intentional deception is that FullBeauty extended the promotions "on an ad hoc basis in response to data from the sale." *Id.* at 23. Again, FullBeauty ignores the requirements of Rule 12(b)(6) and invites the Court to question the truth of the allegations of the Amended Complaint and draw inferences against Kempf. The Court declines to do so. The Court also notes that Kempf has alleged three other ways in which the subject lines of FullBeauty's e-mails were allegedly false or misleading, and FullBeauty has not challenged the sufficiency of Kempf's pleading as to those groups of messages that were potentially not compliant with CEMA.

**B. Federal Preemption**

FullBeauty contends that CEMA is preempted by the Controlling the Assault of Non-Solicited Pornography and Marketing Act ("CAN-SPAM"). This federal preemption theory has already been rejected in two similar cases. *See Ma v. Nike, Inc.*, --- F. Supp. 3d ---, 2026 WL 100731 (W.D. Wash. Jan. 14, 2026); *Harrington v. Vineyard Vines, LLC*, --- F. Supp. 3d ---, 2025 WL 3677479 (W.D. Wash. Dec. 18, 2025), *reconsideration denied*, 2026 WL 125134 (W.D. Wash. Jan. 16, 2026). As explained in those earlier decisions, federal law expressly allows States to prohibit by "statute, regulation, or rule" either "falsity or deception" in "any portion of a commercial electronic mail message or information attached thereto." 15 U.S.C. § 7707(b)(1). CEMA's provision forbidding the inclusion of false or misleading information in the subject line of an e-mail (RCW 19.190.020(1)(b)) falls squarely within the area that CAN-SPAM reserved to the States. *Harrington*, 2025 WL 3677479, at *1; 2026 WL 125134, at *1; *see also Ma*, 2026 WL 100731, at *2.

Like the defendant in *Harrington*, FullBeauty cites for support both *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040 (9th Cir. 2009) (hereinafter "*Virtumundo*"], and *Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348 (4th Cir. 2006). Neither of these cases is relevant. *See Harrington*, 2025 WL 3677479, at *1; 2026 WL 125134, at *1 n.2. In *Virtumundo*, the Ninth Circuit did not address whether CAN-SPAM preempts the subsection of CEMA that is at issue in this matter, namely RCW 19.190.020(1)(b). *See* 2025 WL 3677479, at *1. The Fourth Circuit's decision in *Omega World Travel* concerned an Oklahoma statute that "reach[ed] beyond common law fraud and deceit,"

and prohibited e-mails that contain "malicious," as opposed to false or misleading, information. 2026 WL 125134 at *1 n.2.

FullBeauty further asserts that, to prevail on her CEMA claim, Kempf must prove (i) the materiality of, and her reliance on, the allegedly false or misleading e-mail subject lines, (ii) FullBeauty's scienter with respect to falsity, and (iii) damages, and that her failure to plead these elements of fraud "with particularity," see Fed. R. Civ. P. 9(b),[7] requires the dismissal of her CEMA and CPA claims. CEMA claims do not, however, sound in fraud, *Gordon v. Impulse Mktg. Grp., Inc.*, 375 F. Supp. 2d 1040, 1048 (E.D. Wash. 2005), and they need not do so to avoid preemption by CAN-SPAM.[8] *See Ma*, 2026 WL 100731, at *3; *Asis Internet Servs. v. Consumerbargaingiveaways, LLC*, 622 F. Supp. 2d 935, 942 (N.D. Cal. 2009) (CAN-SPAM "does not define the words

---

[7] Even when the heightened pleading standards associated with "fraud or mistake" apply, "intent, knowledge, and other conditions of a person's mind may be alleged generally," see Fed. R. Civ. P. 9(b), and all that is expected of a plaintiff is to "allege the 'who, what, when, where, and how' of the alleged misconduct," see *Ma*, 2026 WL 100731, at *4 (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). Kempf has satisfied the requirements of Rule 9(b).

[8] In arguing that Kempf's CEMA claim is preempted, FullBeauty refers to the requirements for statutory standing to sue under CAN-SPAM. *See* Def.'s Mot. at 10 (docket no. 25) (citing *Virtumundo*, 575 F.3d at 1054). CAN-SPAM authorizes a "narrow group of possible plaintiffs" to bring private actions, namely Internet access service providers "adversely affected" by violations of CAN-SPAM. *See Virtumundo*, 575 F.3d at 1049–50 (citing *inter alia* 15 U.S.C. § 7706(g)). FullBeauty suggests that, to the extent Kempf's CEMA claim is not premised on actual injury or damages, it burdens commercial e-mails more than CAN-SPAM does and is therefore preempted. This analysis is flawed because it presupposes that commercial e-mails with false or deceptive subject lines deserve protection from litigation. CAN-SPAM's savings clause tells us otherwise; States are expressly permitted to provide private avenues of relief for false or deceptive commercial e-mails. *See* 15 U.S.C. § 7707(b)(1). Moreover, FullBeauty's contention that Kempf has not alleged "she read the subject lines or even opened the emails" at issue, Def.'s Mot. at 11 (docket no. 25), simply ignores what Kempf has said in her operative pleading. *See* Am. Compl. at ¶ 67 (docket no. 22) (indicating that Kempf "clicked on links contained in FullBeauty emails").

'falsity' and 'deception.' Congress, however, is certainly familiar with the word 'fraud' and choose not to use it; the words 'falsity or deception' suggest broader application."); *see also* *Asis Internet Servs. v. Subscriberbase Inc.*, No. 09-3503, 2010 WL 1267763, at *12 (N.D. Cal. Apr. 1, 2010) ("Congress explicitly crafted the savings clause so that preemption would turn on whether a state statute targets the behavior of advertisers: '[State s]tatutes that prohibit fraud and deception in e-mail do not raise the same concern [of inconsistency], because they target behavior that a legitimate business trying to comply with relevant laws would not be engaging in anyway.'" (alteration in original, quoting S. Rep. No. 108-102, at 22 (2003))).

In *Brown*, the Washington Supreme Court made clear that "'representations of fact–like the duration or availability of a promotion, its terms and nature, the cost of goods, and other facts' on which Washington residents would depend 'in making their consumer decisions'–are subject to CEMA's subject-line standards." *Harrington*, 2025 WL 3677479, at *1 (quoting *Brown*, 4 Wn.3d at 596). Kempf has provided specific examples of e-mails sent by FullBeauty with subject lines containing allegedly false or misleading information about the duration and availability of a sale and the advertised discounts, and FullBeauty's contention that she must plead more to state a plausible claim for statutory damages lacks merit. Because plaintiff's CEMA claim is well pleaded and not preempted by federal law, the Court now turns to the issue of CEMA's constitutionality.

/ / /

/ / /

**C. Constitutionality**

FullBeauty's constitutional challenge to CEMA under the dormant Commerce Clause was deemed lacking in merit over two decades ago. *See Washington v. Heckel*, 143 Wn.2d 824, 24 P.3d 404, *cert. denied*, 534 U.S. 997 (2001). Nothing since *Heckel* suggests a different result. The United States Supreme Court has warned that "extreme caution" should be used when deploying the judicially-created dormant Commerce Clause doctrine. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023).[9] Recent jurisprudence concerning the dormant Commerce Clause has three "key strands," *Flynt v. Bonta*, 131 F.4th 918, 923 (9th Cir. 2025), which involve (i) antidiscrimination principles, (ii) an "extraterritoriality" theory, and (iii) a balancing test associated with *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Although FullBeauty relies solely on the latter two concepts, the first inquiry, *i.e.*, whether the state law discriminates against interstate commerce, is the starting point for a dormant Commerce Clause analysis. *See Flynt*, 131 F.4th at 926.

/ / /

/ / /

---

[9] The Washington Attorney General has criticized FullBeauty for failing to cite, in its motion to dismiss, the Supreme Court's decision in *National Pork Producers*, and for referring "only in passing" to the Ninth Circuit's opinion in the matter. *See* Intervenor's Resp. at 13 n.11 (docket no. 33). The Ninth Circuit has, however, itself recognized that, because a majority of the justices did not agree on certain issues in *National Pork Producers*, the Ninth Circuit's opinion remains binding in those areas. *See Iowa Pork Producers Ass'n v. Bonta*, No. 22-55336, 2024 WL 3158532, at *3 (9th Cir. June 25, 2024) ("Because only the result in *NPPC II* is binding, and there is no controlling reason, we remain bound by our decision in *NPPC I*." (referencing *Nat'l Pork Producers Council v. Ross (NPPC I)*, 6 F.4th 1021 (9th Cir. 2021), *aff'd*, 598 U.S. 356 (2023) (*NPPC II*))).

**1. Antidiscrimination Principles**

In *National Pork Producers*, the Supreme Court observed that the "anti-discrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence," and it "prohibits the enforcement of state laws 'driven by . . . 'economic protectionism–that is regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.''" 598 U.S. at 369. FullBeauty does not, however, suggest that CEMA discriminates against interstate commerce or benefits or is designed to benefit "in-state economic interests by burdening out-of-state competitors." *See id.* Indeed, CEMA treats Washington-based entities the same as out-of-state businesses. The statute's prohibition on e-mails containing false or misleading information in their subject lines applies "evenhandedly" to any "person." *See Heckel*, 143 Wn.2d at 833; *see also* RCW 19.190.020(1)(b). Thus, CEMA does not "implicate the core concern at the heart of the dormant Commerce Clause." *See Flynt*, 131 F.4th at 926.

**2. "Extraterritoriality" Theory**

FullBeauty attacks the validity of CEMA using arguments that the Supreme Court has charitably characterized as "ambitious." *Nat'l Pork Producers*, 598 U.S. at 371. Relying on *Healy v. Beer Institute*, 491 U.S. 324 (1989), FullBeauty contends that CEMA violates the dormant Commerce Clause by regulating conduct "'occurring wholly outside the boundaries of' Washington." Def.'s Mot. at 13 (docket no. 25) (quoting *Healy*, 491 U.S. at 336). The Supreme Court has rejected this "extraterritoriality" theory, which seeks to preclude in an "almost *per se*" manner state laws that "have the 'practical effect

of controlling commerce outside the State,' even when those laws do not purposely discriminate against out-of-state economic interests." *See* *Nat'l Pork Producers*, 598 U.S. at 371–76. The Supreme Court has explained that an "almost *per se*" rule against extraterritorial effect "would cast a shadow over laws long understood to represent valid exercises of the States' constitutionally reserved powers," including the authority to tax, regulate the local environment, and set standards concerning, for example, securities, charities, franchises, torts, and matters of health. *Id.* at 374–75. State legislation in these areas might influence where an entity chooses to locate its facilities or offer its goods or services, but such potentially extraterritorial impact does not alone render the State's conduct constitutionally infirm. *See* *id.*

The proper inquiry under the dormant Commerce Clause should not focus on whether a statute or regulation has merely a "practical effect" outside the State, but rather on whether the law has a "*specific* impermissible 'extraterritorial effect'" that prevents out-of-state ventures from being competitive with in-state businesses. *Id.* at 374 (emphasis in original); *Flynt*, 131 F.4th at 924. FullBeauty fails to articulate any way in which CEMA inhibits out-of-state commercial e-mailers differently from those inside Washington. Regardless of where the sender is located, if the e-mail is targeted at a person the sender knows or has reason to know is a Washington resident, and the e-mail includes false or misleading information in its subject line, the sender faces potential liability. Although the Supreme Court has "left open the possibility that 'a law that *directly* regulated out-of-state transactions by those with *no* connection to the State' could violate the dormant Commerce Clause," *see* *Flynt*, 131 F.4th at 924 (emphasis in original,

quoting Nat'l Pork Producers, 598 U.S. at 376 n.1 (discussing Edgar v. MITE Corp., 457 U.S. 624 (1982))), FullBeauty makes no showing that CEMA "directly" regulates out-of-state transactions or that, when sending commercial e-mails to Washington residents, FullBeauty has "no" connection to Washington. FullBeauty's attempt to invoke Healy and an "extraterritoriality" theory flies in the face of clear and binding jurisprudence.

**3. "*Pike* Balancing"**

FullBeauty's final argument, which relies on "Pike balancing," likewise lacks merit. In Pike, the Supreme Court distilled from prior decisions the following "general rule" or balancing test:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, but more frequently it has spoken in terms of "direct" and "indirect" effects and burdens.

397 U.S. at 142 (citations omitted). In National Pork Producers, the Supreme Court reiterated that "'no clear line' separates the Pike line of cases from our core anti-discrimination precedents," 598 U.S. at 377, and "the Supreme Court 'has not invalidated a law under Pike' in more than 30 years," Flynt, 131 F.4th at 931 (quoting Truesdell v. Friedlander, 80 F.4th 762, 773 (6th Cir. 2023)). Pike and its progeny serve "as an important reminder that a law's practical effects may also disclose the presence of a discriminatory purpose." NPPC II, 598 U.S. at 377; see NPPC I, 6 F.4th at 1032

("[M]ost statutes that impose a substantial burden on interstate commerce do so because they are discriminatory." (alteration in original, quoting *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris*, 729 F.3d 937, 952 (9th Cir. 2013))).

The threshold requirement for a "*Pike* balancing" is a plausible allegation that the challenged law imposes a "substantial" or "significant" burden on interstate commerce. *See* *Flynt*, 131 F.4th at 925; *Iowa Pork Producers*, 2024 WL 3158532, at *3; *NPPC I*, 6 F.4th at 1032; *see also* *supra* note 9. The only "burden" asserted by FullBeauty is the work of determining the residency associated with each e-mail address. *See* Def.'s Mot. at 17–18 (docket no. 25). This "burden" does not, however, affect interstate commerce; it does not discriminate between in-state and out-of-state firms or fall more heavily on the latter. Moreover, if FullBeauty took care not to include any false or misleading information in the subject lines of its electronic messages, then it would not need to shoulder any "burden" of determining whether the e-mails were going to Washington residents.[10] The Court concludes that a "*Pike* balancing" is not necessary because

---

[10] FullBeauty has attempted to raise an "as applied" (in addition to its facial) challenge to the constitutionality of CEMA, accusing Kempf of failing to allege that she was in Washington when she received the e-mails at issue, and arguing that such pleading deficiency renders CEMA invalid "as applied." *See* Def.'s Mot. at 11 & 20 (docket no. 25). FullBeauty's argument attacks Kempf's Amended Complaint, not the statute under which she has brought suit. If Kempf had not pleaded the Washington residency or knowledge thereof required for liability under CEMA, then the appropriate relief would be dismissal of her claim, not invalidation of the statute. Kempf has, however, alleged that she is a citizen of Washington, that FullBeauty had actual and/or constructive knowledge of her residency, and that she has, while located in Washington, clicked on links in e-mails received from FullBeauty. *See* Am. Compl. at ¶¶ 5, 46–62, & 67 (docket no. 22). To the extent that the "as applied" challenge is premised on speculation that Kempf was located outside of Washington when she received one or more of the e-mails at issue, it is not consistent with either evidentiary or Rule 12(b)(6) standards or with the Supreme Court's general rejection of the "extraterritoriality" theory.

FullBeauty has not articulated any "substantial" or "significant" burden on interstate commerce.

Precluding the State from enforcing its law "in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" _Nat'l Pork Producers_, 598 U.S. at 390. In this matter, no infraction, let alone a clear infraction, has been demonstrated. For the reasons stated in this Order, CEMA does not violate the dormant Commerce Clause.[11]

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1) FullBeauty's motion to dismiss, docket no. 25, is DENIED. The Court CONCLUDES that (i) the Amended Complaint, docket no. 22, plausibly pleads that FullBeauty had actual and/or constructive knowledge of Kempf's Washington residency before sending her one or more e-mails with allegedly false or misleading subject lines; (ii) the state statute at issue (CEMA) is not preempted by federal law (CAN-SPAM); and (iii) CEMA does not violate the dormant Commerce Clause.

/ / /

/ / /

---

[11] In a footnote, FullBeauty has suggested that the damages sought by Kempf under CEMA are "unduly punitive," and therefore constitute a due process violation. _See_ Def.'s Mot. at 12 n.4 (docket no. 25). The Court declines to address this issue because it was insufficiently briefed and it prematurely seeks a ruling on a constitutional question; if Kempf does not prevail with respect to FullBeauty's liability, then the Court will not need to consider whether a specific amount of damages is unconstitutionally excessive. _See_, _e.g._, _Lyng v. Nw. Indian Cemetery Protective Ass'n_, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

(2) The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 12th day of February, 2026.

Thomas S. Zilly
United States District Judge